## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 21 2015, 6:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
MOTHER

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEY FOR APPELLANT
FATHER

Jeffrey E. Stratman
Aurora, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: B.W., Minor Child

B.F., Father, and W.W., Mother,
*Appellants-Respondents*,

v.

The Indiana Department of Child Services,
*Appellee-Petitioner*.

December 21, 2015

Court of Appeals Case No.
21A05-1505-JT-511

Appeal from the Fayette Circuit Court

The Honorable Jack A. Tandy, Senior Judge

The Honorable Beth A. Butsch, Judge

Trial Court Cause No.
21C01-1412-JT-324

**Brown, Judge.**

W.W. ("Mother") and B.F. ("Father") appeal the involuntary termination of their parental rights with respect to their son B.W. Mother and Father raise one issue, which we revise and restate as whether the evidence is sufficient to support the termination of their parental rights. We affirm.

*Facts and Procedural History*

On July 30, 2003, B.W. was born. On May 20, 2011, Father pled guilty to dealing in a narcotic drug as a class B felony and being an habitual offender. On June 17, 2011, the trial court sentenced Father to the Department of Correction ("DOC") for twelve and one-half years, enhanced by ten years for his status as an habitual offender, for an aggregate sentence of twenty-two and one-half years. In 2012, Mother was convicted of possession of a controlled substance.[1]

In June 2013, DCS received reports alleging a lack of supervision of B.W., that Mother was using drugs, and that B.W. was a victim/perpetrator of sex abuse. Kathy Hobson, a DCS family case manager supervisor, went to the home and "found that the allegations were true." Transcript at 46.

---

[1] At the December 3, 2014 hearing, Mother was asked when she was convicted of possession of a controlled substance, and she replied: "Um, just about two years ago I think." Transcript at 18. The record does not reveal Mother's sentence for her conviction.

[4] On July 12, 2013, DCS filed a verified petition alleging that B.W. was a child in need of services ("CHINS"). DCS alleged that B.W. had exhibited sexually maladaptive behaviors including anally penetrating his five-year-old cousin and performing fellatio on him. DCS also alleged that B.W. started fires in his home and that Mother's ability to care for and manage B.W.'s behavior was impaired by her drug use.

[5] On July 16, 2013, the court entered an Order on Initial/Detention Hearing. The court found that Father denied the allegations and that Mother admitted the allegations. The court appointed an attorney for Father and ordered that the detention of B.W. was authorized or necessary to protect him and that it was in his best interests to remove him from the home environment. On August 14, 2013, the court entered an Order on Admission in which it found that both parents admitted the allegation that B.W. was a CHINS.

[6] On September 6, 2013, the court entered an Order of Participation and a Dispositional Order. The court found that Mother and Father admitted that B.W. had exhibited sexually maladaptive behaviors including anally penetrating his five-year-old cousin and performing fellatio on him. The court also found that B.W. was a CHINS because he started fires in his home and Mother's ability to care for and manage his behavior was impaired by her drug abuse. The court ordered Mother to contact the case manager every week, allow the family case manager to make announced and unannounced visits to the home, enroll in recommended services, keep all appointments, not use controlled substances, complete a substance abuse assessment and follow all

treatment recommendations, submit to random drug screens, and maintain suitable, safe, and stable housing. At some point, Mother moved to Richmond despite service providers discouraging her from moving away from her support and family in Fayette County.

[7] On December 30, 2013, the court entered an Order on Periodic Case Review finding that Mother and Father were incarcerated. On March 21, 2014, the court entered an Order on Periodic Case Review in which the court found that Mother had not enhanced her ability to fulfill her parental obligations.

[8] On June 30, 2014, the court entered an Order Approving Permanency Plan in which it found that Mother failed to participate in outpatient substance abuse treatment on three occasions, declined inpatient treatment, and tested positive for hydromorphone, morphine, Alprazolam, and hydrocodone. The court found that Father remained incarcerated and was unable to fulfill parental obligations, and appointed counsel for Mother. On September 10, 2014, the court entered an Order on Periodic Case Review finding that the projected date for B.W.'s adoption was March 2015.

[9] On October 24, 2014, Family Case Manager (FCM) Melissa Sparks, drove to Richmond to pick up Mother, who did not have an automobile, to take her to Connersville for a family team meeting to discuss visitations and services, but Mother did not answer the door at 8:15 a.m. and later said that her alarm did not go off and she had overslept. On November 21, 2014, Mother called Sparks and said that she wanted to meet with her the following Monday. Sparks told

her that she was more than willing to do that; however, Mother then failed to contact her. Meanwhile, in September 2014, Mother completed treatment at Tara Treatment Centers, but she did not follow through with the recommended services including outpatient substance abuse treatment, individual therapy, attendance at A.A. meetings, and maintaining contact with a sponsor.

On December 3, 2014, the court held a review hearing. At the hearing, Sparks testified that Mother completed treatment at Tara Treatment Center in October 2014, but did not consistently stay in contact with her, and that B.W. attempted to call Mother twice and was unable to contact her. Melanie Bailey, the court appointed special advocate (CASA), testified that she recommended that B.W. stay in his current placement, that B.W. loves Mother, that Mother "has refused services offered to her from Centerstone," and that she refused "life skills, basic skills . . . ." *Id.* at 22.

On December 4, 2014, DCS filed a Verified Petition for Involuntary Termination of Parental Rights. On December 17, 2014, the court held an initial hearing and appointed counsel for Mother and Father.

Meanwhile, on December 11, 2014, DCS filed a Motion to Modify Dispositional Decree requesting that a change in the permanency plan to adoption was appropriate, and that cessation of DCS provided services was appropriate because Mother and Father had not complied with them and/or failed to benefit from the services. On January 14, 2015, the court held a hearing on DCS's motion and granted it by approving the change of the

permanency plan to adoption and approving DCS's request that services to parents cease. The court also stated:

> [I]f I guess at some point [Mother] makes a specific request if she wants services and is willing to follow through then I would certainly look at that and consider that. I'm just saying I don't see this as a permanent order but she needs to step up to the plate and do something if she's serious about it.

*Id.* at 38. Despite the order, Sparks still attempted to stop by and contact Mother once or twice a month.

[13] On April 1, 2015, the court held a hearing. Hobson, the family case manager supervisor, and Sparks testified. Hobson testified that Mother never completely agreed that she had a substance abuse problem. When asked what she meant, Hobson stated:

> Um, [Mother] makes lots of um, to make excuses um, she's not using, she is using, she's using a legal prescription or it's not . . . it's been a constant battle throughout the case of [Mother] struggling with addiction. We've made multiple referrals to get [Mother] the help that she needs throughout all the different case managers. Each different case managers tried to assist [Mother] getting off drugs and I believe today she's under the influence still.

*Id.* at 51.

[14] Megan Jackson, an employee at Centerstone and the liaison to DCS, testified that Mother completed a substance assessment and had referrals for a substance

use group, but she was ultimately removed for non-attendance. She also testified that she had a referral for supervised visitation, but she was unable to schedule those with Mother because she was not able to contact her via telephone. Jackson testified that Mother's first intake was on January 14, 2014, but that group sessions did not begin until March 17, 2014, because she had difficulty contacting Mother, and that Mother cancelled or failed to show for appointments in March, April, June, and July 2014. According to Jackson, Mother's group therapist removed her from the group based on "non-attendance and non-investment" in April 2014, Mother was later readmitted to the group, and she subsequently cancelled or failed to show for appointments. *Id.* at 95.

[15] Sparks testified that she was assigned the case in August 2014, that she made referrals for detox services, substance abuse treatment, home-based case management and therapy, and supervised visitation, and that:

> [Mother] has not been compliant with the services insofar as um, she will start and stop a lot of the services that were ordered um, she will state that she wants to do the services and referrals will be made for those services but then um, [Mother] will only meet a couple of times and then be [un]able to be contacted or will not show up for services.

*Id.* at 56. According to Sparks, Mother ultimately completed inpatient treatment at Tara, but did not follow through with any of the recommended services, including outpatient substance abuse treatment, individual therapy, attendance at A.A. meetings, and maintaining contact with a sponsor. In

October or November 2014, Mother attended two sessions at Meridian, a service provider, but Sparks received an email in January 2015 from Meridian indicating that they had not been able to contact Mother and that they were going to have to "close that out because they had not met with her . . . ." *Id.* at 72. Sparks also stated that Mother was inconsistent with staying in contact with any of the service providers or the family case managers, following through with goals, and making phone calls to B.W. She further testified that Mother failed to contact her on a weekly basis as required by the dispositional order, and that Sparks would call and leave messages, but Mother would not return the calls.

[16] With respect to suitable housing, Sparks testified that she went to the address Mother provided as her current home several times each month and twice a month since December 2014 and knocked on the door, but no one answered, and that Mother has not enhanced her ability to parent B.W. because of her lack of consistency and her inability to follow through with services and stay in contact with DCS.

[17] With respect to Father, Sparks testified that Father expressed an interest in B.W., but due to his incarceration he realizes that he will not be able to provide for him. She testified that she had not been able to provide direct services to Father because of his incarceration, and that his scheduled release date is 2023, at which time B.W. will be an adult.

[18] The court appointed special advocate (CASA), Melanie Bailey, testified that Mother had not been cooperative and did not respond to her texts or calls. Bailey suggested to Mother that she write a letter to B.W., but Mother did not do so. Bailey testified that she agreed that adoption was in B.W.'s best interest because he has improved, now has self-esteem, and has bonded with his foster family. On cross-examination, she stated that she believed that Mother wants to reunite with B.W. but Mother did not do anything in a committed way.

[19] DCS presented evidence that Mother tested positive for opiates, including hydromorphone and morphine, in March 2014, opiates, including hydrocodone, in June 2014, and THC in December 2014.

[20] Father testified that he had not seen B.W. since 2010, that his scheduled release date is 2023, and that he participated in services made available to him at the DOC.

[21] Mother testified that she previously admitted that B.W. was a CHINS in part because of her illegal drug use, that she cancelled multiple appointments with Centerstone, that she was experiencing "really bad anxiety about everything" and could not cope, and that Jackson said that she "would set something up" but never did. *Id.* at 145. When asked whether she stopped using illegal substances, Mother answered: "Um, I had a really bad problem and I did work on it. I did go to rehab and I think it was detox and um, I have been going to narcotic anonymous classes when I can. I've done them over the Internet um, I am doing better than I have in a very long time so um . . . ." *Id.* at 147. She

testified that she moved to Richmond for a fresh start with new people, and that she called Sparks every week or more than once a week, but her anxiety and depression became so bad that she "couldn't just beg her anymore." *Id.* at 153.

[22] According to the combined testimony of Sparks, B.W.'s therapist, and the foster mother, B.W. was initially defiant, and while at the time of the April 2015 hearing, he refused to discuss the sexually maladaptive behavior, he was doing well generally, had improved, and felt safe in the foster family home.

[23] On April 28, 2015, the court entered an order terminating Father and Mother's parental rights, making detailed findings of fact, and concluding that there is a reasonable probability that the conditions resulting in B.W.'s removal will not be remedied, or that continuation of the parent-child relationship poses a threat to the well-being of B.W., that termination is in B.W.'s best interests, and that adoption is a satisfactory plan for him.

## *Discussion*

[24] The issue is whether the evidence is sufficient to support the termination of Mother and Father's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of

the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[25]  The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social

consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dept. of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[26] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), *reh'g denied*). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A)).

A. *Remedy of Conditions*

[27] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of B.W. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[28] In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *Id.* (citation and internal quotation marks omitted). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only

temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.*

[29] Mother and Father argue that DCS presented insufficient evidence to support a reasonable probability that the conditions resulting in removal will not be remedied. Mother admits that she did not have a "swift path to recovery and made some missteps along the way," but she was combatting her drug addiction. Mother's Brief at 18. She asserts that "she did test positive for pot, but compared to an opiate addiction, the use of just marijuana shows major progress toward becoming drug free." *Id.* at 19. She points to her December 2014 negative test for opiates following her inpatient therapy.

[30] Father argues that, although he is not currently scheduled to be released until 2023, he is making efforts to reduce, modify, or reverse his sentence through petitions for post-conviction relief or sentence modification. Without citation to the record or authority, he asserts that it is not uncommon for incarcerated defendants to receive early release to parole or a reduction in time, especially when the inmate is actively participating in services and programs offered by the DOC.

[31] DCS states that Mother and Father do not specifically challenge any of the court's findings of fact, that Mother's argument continues to minimize her substance abuse issues, and that the trial court's conclusion that Mother and Father would not likely remedy their conditions is not clearly erroneous.

[32] The record reveals that Mother admitted that B.W. was a CHINS in part because of her illegal drug use. Since the September 6, 2013 order requiring that she not use controlled substances, in March 2014 Mother tested positive for opiates, including hydromorphone and morphine, in June 2014 for opiates, including hydrocodone, and for THC in December 2014. She did not follow through with any of the services recommended after completing inpatient. Sparks testified that Mother had not enhanced her ability to parent B.W. because of her lack of consistency and her inability to follow through with services. The record also reveals that Father's scheduled release date is 2023, when B.W. will be an adult.

[33] Based upon the court's findings and the record as set forth in part above, we conclude that clear and convincing evidence supports the trial court's determination that there was a reasonable probability that the conditions leading to B.W.'s removal would not be remedied.

B. *Best Interests*

[34] We next consider Mother and Father's assertion that DCS did not present clear and convincing evidence that termination was in B.W.'s best interests. They state that DCS failed to show the current arrangement is detrimental to B.W. beyond the generally accepted notion that children are better off in a stable and permanent environment. DCS maintains that the totality of the evidence including the testimony of FCM Sparks and CASA Bailey support the trial court's conclusion.

[35]    We are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*. This court has previously recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*.

[36]    To the extent Father cites *In re G.Y.*, the Indiana Supreme Court issued that decision in April 2009, concluding that termination of a mother's parental rights was not in the child's best interests where mother made a good-faith

effort to complete the required services available to her in prison, obtained suitable housing and gainful employment upon her release, and maintained a consistent and positive relationship with the child. 904 N.E.2d at 1263-1264. The Court observed that mother had delivered cocaine to a police informant a year before the child's birth and that there were no allegations that mother engaged in any criminal behavior during the child's life. *Id.* at 1258. Further, the Court stated that, at oral argument, mother's counsel confirmed that her projected release date was June 2009 and maybe as early as May. *Id.* at 1262-1263. Unlike the parent in *G.Y.*, Father committed his offense after B.W.'s birth, has not seen B.W. since 2010, and his scheduled release date is in 2023 when B.W. will be an adult.

[37] The record reveals that, while Mother completed inpatient treatment, she did not follow through with any of the services recommended by the service providers. Sparks testified that Mother had not been compliant and failed to follow through with services or keep appointments or maintain contact with DCS. She also testified that Mother had not enhanced her ability to parent B.W. CASA Bailey testified that Mother had not been cooperative and that adoption was in B.W.'s best interests.

[38] Based on the totality of the evidence and in light of our deferential standard of review, we conclude that the court's determination that termination is in B.W.'s best interests is supported by clear and convincing evidence. *See In re J.C.,* 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (observing that "[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal

will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests"), *reh'g denied*; *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*. *See also In re E.M.*, 4 N.E.3d at 649 (holding that incarceration alone cannot justify "tolling" a child-welfare case and concluding that, because the trial court could reasonably have reached either conclusion, our deferential standard of review is dispositive and it was not clearly erroneous for the trial court to conclude that, after three and a half years, Father's efforts simply came too late, and that the children needed permanency even more than they needed a final effort at family preservation).

## *Conclusion*

[39]     We conclude that the trial court's judgment terminating the parental rights of Father and Mother is supported by clear and convincing evidence. We find no error and affirm.

[40]     Affirmed.

Kirsch, J., and Mathias, J., concur.